

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00132-CV

———————————————————

THOMAS WAYNE EVANS, Appellant

V.

SANDRA LYNN EVANS, Appellee

On Appeal from the 89th District Court
Wichita County, Texas
Trial Court No. 187,526-B

Before Sudderth, C.J.; Gabriel and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Thomas Wayne Evans (Thomas) appeals the trial court's final decree of divorce. In three issues, Thomas argues that the trial court abused its discretion by (1) ordering that he pay spousal maintenance to appellee Sandra Lynn Evans (Sandra), (2) ordering that he pay spousal maintenance in excess of the statutory limit, and (3) not ordering that he was entitled to reimbursement for improvements made to Sandra's separate property. Because we conclude that the trial court did not abuse its discretion by ordering spousal maintenance but that the trial court ordered the spousal maintenance in excess of the statutory limit and because we conclude that Thomas failed to provide sufficient evidence that he was entitled to reimbursement, we reverse and remand in part and affirm in part.

## II. BACKGROUND

After more than eighteen years of marriage, Thomas filed his petition for divorce pleading that the marriage had become "insupportable because of discord or conflict of personalities." Sandra filed a general denial and a counterpetition requesting, among other relief, that the trial court order that Thomas pay post-divorce spousal maintenance. Trial was to the court.

### A. Sandra's Testimony

Sandra testified at trial. Sandra said that she owned a house that was her separate property on Rose Street in Burkburnett. According to Sandra, she acquired

2

the house in a previous divorce on August 9, 1999. She further stated that Thomas had moved into the house in April 1999 but that he did not begin helping with house payments until July 1999—Thomas and Sandra married on August 21, 1999. Sandra said that after their marriage, she and Thomas began to pay the Rose Street house payments from community funds. By Sandra's account, two years after the couple married, and because it was required under her previous divorce decree, she and Thomas refinanced the house in both of their names, but the deed remained in her name.

Regarding her plans for housing, Sandra averred that a tax appraisal had recently valued the Rose Street house at $114,000, that she had currently listed the house for sale at $145,000, and that there remained $49,000 in debt on the house. She said that she would expect to have roughly $96,000 in proceeds when she sold the Rose Street house; that she expected those proceeds would go toward the purchase of a new home; and that, given realtor fees and closing costs, she was "going to barely have enough to pay for [the new] house."

According to Sandra, Thomas had made "[m]inor improvements" on the house since the couple married, including having new carpet laid, installing a new stove and a new dishwasher, and putting a new steel roof on the house, which she testified cost between $8,000 and $10,000. Sandra stated that these improvements were paid for from the couple's joint checking account that contained community funds, including monies from an income tax return and from both of their jobs. But Sandra admitted

3

that some of the money that went into the joint checking account came from an inheritance that Thomas received after the couple married. Sandra said, however, that she did not know how much money Thomas had inherited and placed into their joint bank account because he had "kept everything hush, hush, and [she] was never told exactly how much money he was given." She also stated that she had never seen a will or even a check demonstrating that any of the monies in their shared account were Thomas's separate property.

Sandra said that other improvements had been made on the house since Thomas received his inheritance. Specifically, Sandra averred that Thomas had painted the ceiling and helped put down linoleum in the kitchen and that, together, they had built and decorated a workshop. By Sandra's account, Thomas and her brothers provided the labor to build the workshop, which has running water and electricity. She admitted that some of the money to build the workshop came from Thomas's inheritance. The couple had opened a fine and performing arts studio in the workshop; Thomas taught on one side of the workshop, and Sandra taught on the other. Sandra referred to the studio as the couple's joint business.

Sandra testified that she drove a 2014 GMC Acadia that was worth $18,000 but that the payoff for the vehicle was $23,000 and that the note on the vehicle was in both her and Thomas's names. Thus, Sandra asked the trial court to order that Thomas be required to help pay her "almost $500 car payment" each month. Sandra said that Thomas drove a 2006 Chevrolet Colorado that was titled in his name alone,

and she asked the court to award the Colorado and any debt associated with it to Thomas. By Sandra's account, the couple also owned a 2006 Chrysler PT Cruiser. She wanted the court to order it sold and to order that the proceeds be divided between herself and Thomas. Sandra further asked the court to order that Thomas assume any debt on his Wichita Falls Teachers Credit Union credit card, which she said had a balance of about $6,000.

Regarding her monthly expenses, Sandra testified that she spent $150 a month on gas and $200 a month on groceries. She averred that she did not know what her monthly utilities would cost until she moved into a new home, but that she was asking the court to order $240 for monthly utility bills, which she said was half of the amount she and Thomas spent on monthly utilities on the Rose Street house. Sandra stated that she incurred more than $350 monthly related to medical co-pays, counseling, physical therapy, and over-the-counter medications and that she was asking the court to consider these amounts in her request for spousal maintenance. Sandra said that she did not expect to need more than $10 a month for clothing purchases, but she would need roughly $30 a month for haircuts. She also said that she would need $200 a month to pay down the credit cards that she would be assuming. According to Sandra, she received $586 monthly from her ex-husband's retirement, and she believed that after subtracting that from her total monthly expenses, she would need roughly $1,122 a month to pay for her living expenses.

5

Sandra testified that she had undergone twenty-one surgeries in the six years leading up to trial, including having had multiple herniated discs removed and replaced with artificial discs, as well as having a spinal stimulator implant, two abdominal surgeries, and two shoulder surgeries. She also explained that she had permanent nerve damage on her left side and that she suffers from severe neuropathy. According to Sandra, the Social Security Administration deemed her disabled in August 2015, but some of these surgeries occurred since receiving that designation. She also stated that she had not paid into Social Security because she had previously been either self-employed or a teacher. Therefore, the only benefit she received from the disability designation was Medicare. Since applying for Medicaid, she received $100 monthly in food stamps, and she believed in the near future that Medicaid would pay her Medicare premiums.

Sandra said that the only way that she had been able to afford her monthly expenses during the pendency of this case was through assistance from family members and charities. She also said that even though the trial court had recently entered orders for Thomas to pay temporary spousal maintenance, he had not fully complied with the orders and still owed her between $800 and $1,300. Sandra averred that Thomas earned $4,185.68 a month and that she was asking the court that 20% of that amount be awarded to her as permanent monthly spousal support given her disabilities.

Sandra testified that Thomas had become abusive towards her after she "caught him with his co-worker at school" in 2013. Specifically, Sandra said that Thomas was mentally and physically abusive toward her, that he had "put hands on" her four times, and that the abuse made the marriage unbearable.

## B. Thomas's Testimony

Thomas testified that he inherited $50,000 when his father passed away, that he had only received $47,000 of that inheritance, and that $40,000 was deposited into a joint bank account the couple had opened and used for the sole purpose of building the workshop. Thomas claimed that the $7,000 that came later was actually a loan from his mother for putting a new roof on the house and installing a carport, but in other testimony, Thomas said that the $7,000 "was part of [his] inheritance to start with." And Thomas claimed that his mother paid the Rose Street house payments "[e]very month" during the four years before trial because he and Sandra had a hard time making ends meet. Thomas asked the court to order that Sandra be entitled to all proceeds from the sale of the house in lieu of spousal support and any entitlement to his retirement account. Thomas agreed that he grossed $4,185.68 and netted $3,667 monthly from his teaching job.

Thomas denied that he had ever physically abused Sandra. Instead, Thomas said that Sandra had once hit him with her car, but he chose not to press charges. He also said that she once attacked him with a tree branch, but he evaded her. Thomas also disputed that he had ever committed infidelity during the marriage. When

confronted with a letter that he had written Sandra in which he apologized for having an "inappropriate relationship at work," Thomas said that Sandra's definition of inappropriate relationship included talking to another woman and that he was attempting to utilize her language in an effort to prevent "hours and hours of bantering" about him having talked to a female co-worker.

Thomas admitted that he did not have a copy of his father's will showing that he had inherited the money deposited into the account used for building the workshop, nor did he have any paperwork to demonstrate when the money was deposited, how much may have been deposited, and where the money was deposited. Instead, Thomas said that his testimony was the only evidence he had that the money used to pay for building the workshop was his separate property.

## C. The Trial Court's Judgment

In the final divorce decree, the trial court granted the divorce, dissolving the marriage on the grounds of insupportability. The court ordered that Sandra was awarded the GMC Acadia (and its related debt) and that she was entitled to 50% of Thomas's retirement benefits accrued during the marriage. The trial court also ordered that Thomas was not entitled to reimbursement for improvements made to the Rose Street house and that Thomas was to pay spousal maintenance in the amount of $900 monthly for an indefinite period or until the death of one of the parties, the remarriage of Sandra, the abeyance of Sandra's disability, or the entry of a new court order.

8

In one of its findings of fact, the court found that Thomas's monthly gross income "[was] greater than $4,500." The court also found that the Rose Street house was Sandra's separate property as she acquired it prior to the marriage and that there was insufficient evidence to show Thomas was entitled to any reimbursement for the improvements on the house. This appeal followed.

## III. DISCUSSION

### A. Spousal Maintenance

In his first issue, Thomas argues that the trial court abused its discretion by ordering that he pay spousal maintenance. Specifically, Thomas argues that Sandra was awarded sufficient property to meet her minimum reasonable needs.

A spouse in a divorce proceeding is eligible to seek spousal maintenance if that spouse lacks sufficient property to meet minimum reasonable needs and cannot support herself due to an incapacitating physical or mental disability. *See* Tex. Fam. Code Ann. § 8.051(2)(A); *In re Green*, 221 S.W.3d 645, 647 (Tex. 2007); *In re Marriage of Elabd*, 589 S.W.3d 280, 283 (Tex. App.—Waco 2019, no pet.). The term "minimum reasonable needs" is not defined in the Family Code, nor are there cases defining the term. *Slicker v. Slicker*, 464 S.W.3d 850, 860 (Tex. App.—Dallas 2015, no pet.). Rather, the minimum reasonable needs for a particular individual is a fact-specific determination that should be made by the trial court on a case-by-case basis. *Id.*

Section 8.054(a)(1) of the Texas Family Code generally limits a trial court's award of spousal maintenance based on the length of the marriage. *See* Tex. Fam.

9

Code. Ann. § 8.054(a)(1); *Green*, 221 S.W.3d at 647; *Elabd*, 589 S.W.3d at 283. But under section 8.054(b), if the spouse seeking maintenance is unable to support herself through appropriate employment because of an incapacitating physical or mental disability, the trial court may order spousal maintenance for an indefinite period of time as long as the disability continues. Tex. Fam. Code Ann. § 8.054(b); *Green*, 221 S.W.3d at 647; *Elabd*, 589 S.W.3d at 283. Additionally, Section 8.056 provides that the obligation to pay future maintenance terminates on the death of either party, the remarriage of the obligee, or if, after a hearing, the trial court determines that the obligee "cohabits with another person with whom the obligee has a dating or romantic relationship in a permanent place of abode on a continuing basis." Tex. Fam. Code Ann. § 8.056; *Green*, 221 S.W.3d at 647; *Elabd*, 589 S.W.3d at 283.

We review a trial court's award of spousal maintenance for an abuse of discretion. *Elabd*, 589 S.W.3d at 283. Under the abuse of discretion standard, legal and factual sufficiency of the evidence are not independent grounds for asserting error, but they are relevant factors in assessing whether the trial court abused its discretion. *Id.*; *Dunn v. Dunn*, 177 S.W.3d 393, 396 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

Here, Thomas does not challenge that Sandra is disabled or unable to work.[1] Rather, Thomas argues that Sandra received a sufficient amount of the marital estate,

---

[1] At trial, Thomas agreed multiple times that Sandra is "physically disabled."

10

including the Rose Street house and 50% of his retirement, to meet her needs. The gist of Thomas's argument is that because she left the marriage with nearly $100,000 worth of assets, she can afford to pay for her roughly $1100 monthly deficiency and thus spousal maintenance is improper. Thomas does not cite any authority to support his position.

We conclude that the trial court had sufficient evidence to order spousal maintenance. After detailing her monthly living expenses, Sandra testified that even after receiving $586 monthly from her previous husband's retirement, she would still need roughly $1,122 a month to cover her necessary living expenses. Further, Sandra testified that this deficient amount did not include a monthly rent or mortgage payment and that the proceeds from the sale of the Rose Street house would go directly into the purchase of a new home so that she did not have a house payment. Sandra said that after the sale of the Rose Street house, given realtor fees and closing costs, she was "going to barely have enough to pay for [the new] house." Thus, the trial court heard evidence that Sandra had not included the costs of stable housing in her request for spousal maintenance because she intended to cover those costs with the proceeds from the sale of the house and that she would continue to incur her monthly deficit despite the fact that she was selling the Rose Street house.

We also reject Thomas's argument that because Sandra was awarded half of his retirement, she has sufficient resources to cover her monthly needs. Indeed, Thomas testified that his retirement annuity would not begin to pay out for another twelve to

fifteen years. Thus, the benefits that Sandra will receive in the future will not support her during the time between the divorce and when Thomas begins to draw from his retirement. And the trial court expressly stated in the decree that when Sandra begins to receive benefits from Thomas's retirement, "that circumstance shall be a consideration in any petition to modify spousal support filed by Thomas." Thus, the trial court considered the financial impact of both Sandra and Thomas receiving his retirement in the future. *See Deltuva v. Deltuva*, 113 S.W.3d 882, 888 (Tex. App.—Dallas 2003, no pet.) ("While Barbara received the majority of the marital estate, the court could have reasonably concluded that her funds would be exhausted before her earnings matched her reasonable minimum monthly expenses."). We overrule Thomas's first issue.

## B. Spousal Maintenance Amount

In his second issue, Thomas argues that the trial court erred by finding that he made in excess of $4,500 a month and thus the ordered $900 in monthly spousal maintenance exceeds the statutory limit. We agree.

The amount of spousal maintenance is confined by statutory limits. Tex. Fam. Code Ann. § 8.055(a). Under Section 8.055(a), the amount of maintenance awarded by the trial court cannot be more than the lesser of $5,000 or twenty percent of the paying spouse's average monthly gross income. *Id.*

The trial court in this case found that Thomas's average monthly gross income "is greater than $4,500" and ordered that Thomas pay $900 (which would be twenty

12

percent of $4,500) monthly to Sandra as spousal maintenance. But the evidence does not support that Thomas's monthly gross income "is greater than $4,500." Even though Thomas testified that in the past he had held part-time employment in addition to his employment as a schoolteacher, he said that he currently was making only his salary at the school and that the income was fixed at $4,185.68 per month. Not only was this evidence not contradicted, but Sandra too testified that Thomas's monthly gross income was $4,185.68. Thus, the maximum amount of spousal maintenance that the trial court could have imposed was $837.14.

Because the amount of maintenance awarded by the trial court is discretionary only within the statutory limits, we will reverse the judgment of the trial court relating to the amount of spousal support awarded and remand for a new trial on the amount of spousal maintenance to be awarded to Sandra. *See id.*; *see also Deltuva*, 113 S.W.3d at 889 (declining to modify the trial court's judgment when there was not undisputed evidence of the length of time spousal maintenance should have been ordered to last); *In re Marriage of Franklin*, No. 10-13-00007-CV, 2013 WL 4799063, at *3 (Tex. App.— Waco Aug. 29, 2013, no pet.) (mem. op.) (holding that trial court imposed a spousal-maintenance amount greater than statutory limits under Section 8.055(a) and remanding to trial court to re-address spousal maintenance amount while affirming trial court's judgment in all other respects). We sustain Thomas's second issue.

## C.  Reimbursement

In his third issue, Thomas argues that the trial court abused its discretion by not awarding him reimbursement for the improvements to the Rose Street property. We disagree.

A claim for reimbursement may include capital improvements to property other than by incurring debt.  Tex. Fam. Code Ann. § 3.402(a)(8).  Reimbursement for funds expended by a marital estate for improvements to another marital estate shall be measured by the enhancement in value to the benefited marital estate.  *Id.* § 3.402(d). The enhanced value is determined by the difference between the fair market value of the property before and after the improvements.  *Matter of Marriage of McCoy & Els*, 488 S.W.3d 430, 435 (Tex. App.—Houston [14th Dist.] 2016, no pet.).  The party claiming reimbursement bears the burden of establishing the net benefit to the payee estate, proving that expenditures were made, and that the expenditures are reimbursable.  *Id.* at 434; *Zeptner v. Zeptner*, 111 S.W.3d 727, 737 (Tex. App.—Fort Worth 2003, no pet.).  Evidence of the cost of improvements alone is not sufficient to prove enhanced value.  *McCoy & Els*, 488 S.W.3d at 435; *see also Anderson v. Gilliland*, 684 S.W.2d 673, 675 (Tex. 1985) (rejecting cost as a measure of reimbursement).  We review a trial court's decision concerning a claim for reimbursement for an abuse of discretion.  *Penick v. Penick*, 783 S.W.2d 194, 198 (Tex. 1988).

Here, the trial court found that Thomas presented "insufficient evidence to support his claim that his separate estate should be reimbursed for funds or assets

expended by his separate estate for the benefit of the community." Thomas testified that he used funds he believed to be his separate property that he had received from an inheritance to improve the Rose Street house, which is Sandra's separate property. In fact, Thomas and Sandra both testified to improvements made to the house during the marriage. Thomas also testified that the amount of funds he expended was $47,000. But Thomas did not present any evidence to show that any enhanced value of the Rose Street house resulted from the improvements. Thus, the trial court did not abuse its discretion by finding that Thomas presented insufficient evidence that he was entitled to reimbursement because Thomas only presented evidence of the cost of improvements to the house. *See Bell v. Bell*, No. 12-04-00244-CV, 2005 WL 1538275, at *7 (Tex. App.—Tyler June 30, 2005, no pet.) (mem. op.) (holding that husband was not entitled to reimbursement because there was no evidence that repairing septic system to house owned by wife separately was a capital improvement to the septic system or the home). We overrule Thomas's third issue.

## IV. CONCLUSION

Having sustained Thomas's second issue that the trial court abused its discretion in its calculation of the amount of spousal maintenance to be awarded, we reverse the judgment of the trial court only as to the amount of spousal maintenance and remand this proceeding to the trial court for a new trial solely on the amount of spousal maintenance to be awarded. Having overruled Thomas's first and third issues, we affirm the judgment of the trial court in all other respects.

15

/s/ Dana Womack

Dana Womack
Justice

Delivered:  April 9, 2020